UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LONNIE MCKISSIC,

Plaintiff,

v.

OKPA and AD,

Defendants.

Case No. 2:24-cv-13454

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [26], AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [40]**

Plaintiff Lonnie McKissic sued Defendants John Okpa and Anthony Adegbola under 42 U.S.C. § 1983 and alleged that they violated his Eighth Amendment rights. ECF No. 1, PageID.1. Both parties filed motions for summary judgment. *See* ECF Nos. 26, 40. Because there are no genuine disputes of material fact, and Defendants are entitled to judgment as a matter of law, the Court will deny Plaintiff's motion and grant Defendants' motion.

**BACKGROUND**

McKissic is a prisoner housed at the Macomb Correctional Facility ("MRF") under the care of the Michigan Department of Corrections ("MDOC"). ECF No. 26, PageID.119–120. Defendants John Okpa and Anthony Adegbola are correctional officers employed by MDOC and assigned to Unit 7 of the MRF. ECF 40, PageID.206. On July 27, 2024, McKissic was attacked by another prisoner, Boersen, while McKissic worked his shift as a floor care porter. ECF No. 26, PageID.120–121; ECF

No. 40, PageID.210. In the three years before the incident, McKissic worked as a third-shift floor care porter in Unit 7, which houses Level IV prisoners receiving mental health treatment in the Residential Treatment Program ("RTP"). ECF No. 26, PageID.120; ECF No. 40, PageID.208.

I. Unit 7 at MRF

Unit 7 is a v-shaped housing complex at MRF that contains two cell blocks, each having an upper and lower level, called wings. ECF No. 41-1, PageID.253–254 (Ex. B, Decl. of Anthony Adegbola). Unit 7 has two wings, each divided into an upper and lower level: A, B, C, and D. *Id.* at PageID.234. The cell blocks are joined by a base area, which includes the prisoner day room, unit exit, and unit bubble, where officers are stationed to monitor cameras and access a control panel. *Id.* The bubble provides officers with line of sight down both cell blocks. *Id.*

While MRF houses prisoners across several security levels, Unit 7 specifically houses Level IV prisoners who are in the Residential Treatment Program receiving mental health treatment. *Id.* The prisoners housed in the B, C, and D wings of Unit 7 are general population prisoners subject to standard Level IV prisoner rules. *Id.*; *see also* ECF No. 40-7, PageID.248 (Ex. F, Decl. of Lawrence McKinney). Level IV prisoners in these wings do not require restraints or escorts to move within the housing unit. ECF No. 40-7, PageID.248. Some of the prisoners housed in the A-Wing have segregation statuses or management plans that require them to have an escort or be placed under restraints while out of their cell. ECF No. 41-1, PageID.254–255.

II. <u>The July 27, 2024, Attack</u>

At 9:30 p.m. on July 27, 2024, McKissic reported to duty as a floor care porter in Unit 7. ECF No. 26, PageID.123. Around 10:20 p.m., Prisoner Boersen, a B-Wing prisoner with no out-of-cell restraint requirement, complained of a head injury, so Defendant Adegbola relayed the complaint to healthcare staff, who arranged for Prisoner Boersen to visit the health clinic. ECF No. 40-2, PageID.229 (Ex. A, Decl. of John Okpa). Defendant Adegbola then remotely opened Prisoner Boersen's cell door from the Unit 7 bubble and instructed him to report to the day room and wait for an officer to bring him to the health care clinic. *Id.*; ECF No. 41-1, PageID.255–256.

Prisoner Boersen made his way to Unit 7's day room, where video from three security cameras captured the following events.[1] The three security cameras each provide a different angle of the unit base area, covering the entire room.[2] The Court

[1] The Court received three MP4 files, one for each security camera, on May 8, 2026, after it granted Defendants leave to file the exhibits. ECF No. 42. The security camera video remains on file with the Court, and all citations to each camera will identify the camera along with a time stamp.

[2] Pursuant to the Court's order, ECF No. 42, Defendants provided McKissic with a copy of the security footage, which he viewed. ECF No. 43, PageID.261; *see also* ECF No. 43-1, PageID.264 (McKissic signing an acknowledgement stating he watched the video from all three security cameras). McKissic later denied having an opportunity to watch the entirety of the security camera video in his reply brief, claiming Defendants violated the Court's order. ECF No. 47, PageID.383–384. Defendants contended the video exhibits they filed and showed McKissic include all existing relevant video. ECF No. 48, PageID.410. The Court concludes Defendants complied with the order for two reasons. First, the Order required Defendants to provide only the security footage they filed as exhibits to the motion. *See* ECF No. 42, PageID.259. And second, Defendants provided a certificate of compliance, ECF No. 43, which included McKissic's signature acknowledging he viewed the security footage. ECF No. 43-1, PageID.264.

will describe the attack based on the collective video from the three security cameras, named (1) Fisheye View; (2) Bubble and Dayroom Angle; and (3) Cell Block Angle.

The video began with McKissic mopping the floor with his back facing away from the stairwell leading to the cell block as Prisoner Boersen made his way down the stairs and into the unit base area. Cell Block Angle, 0:00–0:12. Once in the unit base area, Prisoner Boersen wandered around for a few seconds before walking toward a hallway leading to the bubble's entrance. Cell Block Angle, 0:12–0:25; Bubble & Dayroom Angle, 0:23–0:26. Once Prisoner Boersen was standing near the hallway entrance to the bubble, Defendant Okpa, exited the bubble and entered the unit base area. Bubble & Dayroom Angle, 0:22–0:33; *see* ECF No. 41-1, PageID.256. During that time, McKissic and Prisoner Boersen did not interact with each other or show any sign of apprehension due to the other's presence. Cell Block Angle, 0:05–0:25; Bubble & Dayroom Angle, 0:23–0:33. Once Defendant Okpa entered the unit base area, he walked toward another doorway, appearing to point into the day room. Bubble & Dayroom Angle, 0:33–0:36; Fisheye View, 0:33–0:36. Prisoner Boersen initially followed Defendant Okpa but then changed course and walked toward McKissic, who stood a few feet away with his mop and faced Prisoner Boersen and Defendant Okpa. Bubble & Dayroom Angle, 0:33–0:36. Prisoner Boersen suddenly pulled a prison-made shank from his pocket and lunged at McKissic, making several stabbing motions toward McKissic's head and shoulders. *Id.* at 0:37–0:40. The two struggled for three seconds near the wall before McKissic fell to the ground while Prisoner Boersen took a few steps back. *Id.* Defendant Okpa then ran over and put

himself between McKissic and Prisoner Boersen within a second of McKissic falling to the ground. Bubble & Dayroom Angle, 0:37–0:41. Four seconds elapsed between the time Prisoner Boersen lunged at McKissic and when Defendant Okpa inserted himself between the two. *Id.*; ECF No. 41-1, PageID.256.

With Defendant Okpa standing between McKissic and Prisoner Boersen, two other corrections officers exited the bubble to secure Prisoner Boersen in a separate area. Bubble & Dayroom Angle, 0:49–0:56; Cell Block Angle, 0:50–1:22. A corrections officer then inspected McKissic for injuries. Bubble & Dayroom Angle, 0:57–1:22. No blood appeared on the floor or on McKissic during or after the attack. *See id.* at 0:36–1:23.

Defendants then sent McKissic for evaluation at the health clinic. ECF No. 26, PageID.123. According to McKissic's medical records, the attack resulted in a one-millimeter laceration on the right side of his head and a two-millimeter laceration on top of his head. ECF No. 40-5, PageID.241–242 (Ex. D, McKissic Medical Records). McKissic was not actively bleeding from his wounds, denied any pain, declined bandaging, and only received a topical antibiotic ointment before returning to his housing unit. ECF No. 40-5, PageID.242; *see also* ECF No. 26, PageID.125; ECF No. 40, PageID.211.[3]

[3] McKissic later alleged he was taken to a nearby emergency hospital for further medical treatment, where he was diagnosed with cranial nerve damage. ECF No. 26, PageID.125. As Defendants noted, McKissic's medical records show no emergency hospital visit between June and December of 2024. ECF No. 44, PageID.270; ECF No. 44-3, PageID.279–351. Similarly, McKissic's Step I Grievance, submitted July 30, 2024, made no reference to an emergency hospital visit after the attack. ECF No. 44-2 (McKissic Step I Grievance Form).

III. Procedural History

McKissic sued Defendant on December 26, 2024. ECF No. 1. The parties proceeded to discovery, ECF No. 19, and then filed cross-motions for summary judgment, ECF Nos. 26, 40. In Defendants' motion, they invoked qualified immunity as an affirmative defense to McKissic's Eighth Amendment claims. ECF No. 17, PageID.63.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party must point to specific portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not simply rest on the pleadings but must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Cross motions for summary judgment do not change the summary judgment standard. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (Cleland, J.). Rather, a court

must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

Furthermore, "[w]here uncontroverted video evidence 'so utterly discredit[s]' one party's version of events, so that no reasonable jury could believe him or her, the facts should be viewed 'in the light depicted by the videotape.'" *King v. City of Rockford*, 97 F.4th 379, 389 (6th Cir. 2024) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). Courts must "view any relevant gaps or uncertainties left by the videos in the light most favorable to" the non-moving party. *Laplante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (citation omitted).

## DISCUSSION

Because McKissic and Defendants each filed cross-motions for summary judgment, the Court will consider each motion on its own merits and will draw all reasonable inferences against the moving party. *See Craig*, 823 F.3d at 387.

I. Motions for Summary Judgment on McKissic's Eighth Amendment Claim

The Court will first summarize the elements of an Eighth Amendment deliberate indifference claim before it addresses the parties' cross-motions for summary judgment.

*A. Eighth Amendment Deliberate Indifference Elements*

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. "[A] prison official's deliberate indifference to conditions that

pose a substantial risk to an inmate's health and safety violates the Eighth Amendment." *Finley v. Huss*, 102 F.4th 789, 805 (6th Cir. 2024) (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). Specifically, prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

To establish an Eighth Amendment deliberate indifference claim, a plaintiff must go beyond a mere showing of negligence or lack of due care. *Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986). Rather, a plaintiff must satisfy an objective and subjective prong. "The objective prong asks whether the inmate was incarcerated under conditions posing a substantial risk of serious harm." *Finley*, 102 F.4th at 805 (citing *Farmer*, 511 U.S. at 828). "The subjective prong then asks whether officials knew of and disregarded that excessive risk to the inmate's health or safety." *Id.*

The Sixth Circuit synthesized the subjective prong into three elements a plaintiff must establish: the individual defendants (1) were actually aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) actually drew the inference; and (3) consciously disregarded the risk. *Westmoreland v. Butler*, 29 F.4th 721, 726–27 (6th Cir. 2022) (citing *Farmer*, 511 U.S. at 837, 839); *see also Poynter v. Shirley*, No. 25-5188, 2026 WL 2641092, at *16 (6th Cir. Sep. 8, 2026) ("*Farmer v. Brennan*'s subjective standard properly governs

deliberate-indifference cases brought under the Fourteenth Amendment."). "[A] prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it." *Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011); *see also Reedy v. West*, 988 F.3d 907, 912–16 (6th Cir. 2021) (affirming summary judgment on qualified immunity grounds in favor of a prison counselor who was unaware of the risk of violence posed by a plaintiff's cellmate).

*B. McKissic's Motion for Summary Judgment*

McKissic argued Defendants violated his Eighth Amendment right against deliberate indifference because Defendants "failed to protect and to prevent substantial serious risk of injuries and mental distress." ECF No. 26, PageID.130. From McKissic's motion, the Court identified three arguments to support his Eighth Amendment deliberate indifference claim. First, McKissic argued Defendants violated MDOC rules by not escorting Prisoner Boersen, a Level IV prisoner, once he left his cell to visit the health clinic. *Id.* at PageID.121, 126, 129, 130; *see also* ECF No. 47, PageID.378, 386. Second, McKissic argued, for the first time in the litigation, that he warned Defendants shortly before the attack that Prisoner Boersen had made threats toward McKissic.[4] ECF No. 26, PageID.131, 132, 138; ECF No. 47,

[4] Defendants correctly noted that "it is not appropriate for McKissic to make this new [unpleaded] theory of his claim at this point." ECF No. 44, PageID.271 (citing *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665–66 (6th Cir. 2012)). Given the lenient standard afforded to pro se litigants, *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005), and because the Court ultimately rejects McKissic's unpleaded argument, the Court will still address McKissic's new argument on its merits.

PageID.388. Last, McKissic argued Defendants remained in the bubble during the attack, only intervening after Prisoner Boersen stabbed McKissic several times. ECF No. 26, PageID.121, 124.

All three of McKissic's arguments fail because he did not demonstrate that Defendants violated MDOC rules, and video evidence directly contradicts the claims McKissic made to support his other two arguments, so he cannot satisfy either prong of an Eighth Amendment deliberate indifference claim. The Court will address each argument in turn.

1. Whether Defendants Violated MDOC Rules

To begin, McKissic cited several MDOC rules to support his claim that Defendants' failure to follow such rules resulted in the attack. McKissic specifically alleged MDOC rules and procedures required Defendants to secure and escort Prisoner Boersen when he exited his cell for his health clinic visit. ECF No. 26, PageID.123, 124, 138. To support the argument, McKissic cited MDOC Policy Directive ("PD") 04.04.130(S), which states, "The Warden may require prisoners to be escorted to their destination even if an Offender Daily Schedule or pass has been issued." *Id.* at PageID.121, 126, 129, 130. McKissic also cited PD 04.04.130(T): "Wardens shall identify assignments that pose special security concerns (e.g., night workers, administration building porters)." *Id.* at PageID.126. McKissic also quoted the general policy statement of PD 04.04.130: "Controlled prisoner movement is essential to staff and prisoner safety." *Id.* at PageID.129. Without any accompanying citations to the record, McKissic used his references to PD 04.04.130 to assert that

Defendants were required to escort Prisoner Boersen when he was outside of his cell. *See id.* at PageID.121, 126, 129, 130, 132, 138.

In his reply brief, McKissic cited MDOC Administrative Rule 791.4001, which requires prisoners to receive a security classification "based on the experience of correctional administrators" and establishes levels of restrictive custody. *See* Mich. Admin. Code r. 791.4401; ECF No. 47, PageID.386, 389. The rule also lists certain factors correctional administrators should consider when determining a prisoner's security classification, including two McKissic cited: (1) "[t]he prisoner's need for protection"; and (2) "[t]he safety of others." ECF No. 47, PageID.386 (citing Mich. Admin. Code r. 791.4401(1)(a)–(b)). McKissic cited MDOC Rule 791.4401 to argue Defendants violated MDOC procedure by not escorting Prisoner Boersen or placing him in restraints when he left his cell because Prisoner Boersen had a Level IV security classification. *Id.* at PageID.386, 389.

While McKissic correctly quoted MDOC policies and procedures, he failed to provide any evidence or explain how the record demonstrates that Defendants violated MDOC rules when they allowed Prisoner Boersen to walk down to the unit base area unescorted. Notably, McKissic drew an incorrect conclusion from PD 04.04.130(S). That policy does not require corrections officers to escort, let alone secure, all Level IV prisoners outside of their cell. Rather, PD 04.04.130(S) empowers the warden to exercise his discretion when determining whether to secure and escort a prisoner out of their cell: "The Warden *may* require prisoners to be escorted to their destination." PD 04.04.130(S) (emphasis added).

At best, McKissic's theory amounts to a dispute with Defendants' discretion to allow Prisoner Boersen to exit his cell without an escort. *See* ECF No. 26, PageID.123, 124, 138. A challenge to a prison official's discretion, however, without any record evidence demonstrating that Prisoner Boersen would be dangerous or more dangerous than a normal Level IV prisoner and pose a serious risk of substantial harm to McKissic, cannot amount to an Eighth Amendment claim, let alone satisfy the objective prong. *See Finley*, 102 F.4th at 805 (finding that the Eighth Amendment's objective prong was satisfied when there was "[p]lenty of record evidence" that the decision to place an inmate with serious mental health issues in administrative segregation posed a serious risk to the inmate's safety).

Here, nothing in the record suggests the Defendants were required to secure or escort Prisoner Boersen when he left his cell. Declarations from Defendants Okpa and Adegbola noted Level IV prisoners are not required to have escorts or restraints when outside of their cell. ECF No. 40-2, PageID.229; ECF No. 41-1, PageID.254–255. Similarly, Lawrence McKinney, the Assistant Deputy Warden at MRF, wrote in his Declaration, "[p]risoners assigned to Wings B, C, and D of Housing Unit 7 are Level IV general population prisoners. They do not require restraints or escorts to move within the housing unit." ECF No. 40-7, PageID.248. Nor was Prisoner Boersen on a specific management plan that would have restricted his movement or required restraint when outside his cell. ECF No. 40-6, PageID.245–246 (Ex. E, Decl. of Tisha Walt-Davis, LLP).

McKissic never addressed the merits of the declarations, he merely argued the declarations should not be considered because they were not notarized. ECF No. 47, PageID.380–382. Yet, all of the declarations, except Anthony Adegbola's, are signed, dated, and declared true and correct under penalty of perjury. *See* ECF No. 40-2, PageID.228–231; ECF No. 40-6, PageID.245–246; ECF No. 40-7, PageID.248–249. The declarations therefore satisfy the relevant federal law as valid unsworn declarations. *See* 28 U.S.C. § 1746; ECF No. 48, PageID.409. What is more, the day after Defendants submitted their motion for summary judgment, they filed an errata sheet that included a signed and dated declaration from Anthony Adegbola. ECF No. 41-1, PageID.253–258. Thus, McKissic's argument challenging the validity of the declarations must fail. Accordingly, with no record evidence to support his claim or rebut the declarations from Defendants, McKissic failed to demonstrate that he is entitled to summary judgment on his Eighth Amendment claim because Defendants violated MDOC rules when they did not restrain or escort Prisoner Boersen outside of his cell.

2. Whether Defendants Failed to Act on McKissic's Warning

For the first time in the litigation, McKissic alleged that he warned Defendants during his shift that Prisoner Boersen was "bleeding from his head and making threats" toward McKissic because the latter "refused to pass an item to another prisoner" on behalf of Prisoner Boersen. ECF No. 26, PageID.131, 132, 138; *see also* ECF No. 47, PageID.377–378.

McKissic's allegation that he warned Defendants about Prisoner Boersen bleeding from the head and making threats conflicts with McKissic's complaint, the medical records from McKissic's post-attack visit, and the security video of the moments leading up to the attack.

First, in McKissic's complaint and his reply to his summary judgment motion, he alleged "a prisoner named Boersen #947937 faked a medical emergency in order to get out of his cell to see the in-unit nurse." ECF No. 1, PageID.3; ECF No. 47, PageID.377. McKissic's new allegation from his summary judgment motion implied that he personally witnessed Prisoner Boersen's injured and bleeding head when Prisoner Boersen threatened him despite pleading, and stating in his reply, that Prisoner Boersen faked his head injury. *Compare* ECF No. 1, PageID.3, *and* ECF No. 47, PageID.377 (McKissic stating Prisoner Boersen faked his medical injury), *with* ECF No. 26, PageID.131 (McKissic claiming he saw Prisoner Boersen "was bleeding from his head").

Second, a prisoner incident interview form included in McKissic's medical records from after the attack also conflicts with McKissic's claim that he warned Defendants of Prisoner Boersen's threats toward him. In the prisoner injury report dated July 28, 2024, at 10:30 p.m., the day after the attack, the "Statement of Injured Prisoner" box states that "Prisoner McKissic had no idea why he was assaulted." ECF No. 40-5, PageID.243. McKissic provided no evidence in any of his pleadings or briefs showing he knew Prisoner Boersen would attack him based on an earlier threat, let alone that he warned Defendants of the threat. *See Anderson*, 477 U.S. at 248 (noting

that a properly supported motion for summary judgment must rest upon more than just mere allegations).

Third, the security camera video casts serious doubt on McKissic's new allegation. In the security video, McKissic showed no apprehension toward Prisoner Boersen once the latter entered the unit base area. Cell Block Angle, 0:14–0:17. In fact, McKissic allowed Prisoner Boersen to get closer to him without any apprehension as the latter made his way to the bubble entrance. *Id.* at 0:17–0:21. Similarly, Prisoner Boersen's head did not appear to be bleeding when he entered the unit base area, contrary to McKissic's claim that he saw Prisoner Boersen's head bleeding. *Contrast* Cell Block Angle, 0:14–0:17 (showing Prisoner Boersen's head not bleeding), *with* ECF No. 26, PageID.131, 138 (McKissic alleging he warned Defendants that Prisoner Boersen "was bleeding from his head and making threats" during his shift). At no point while Prisoner Boersen wandered around the unit base area and made his way to the bubble did McKissic seek to distance himself from Prisoner Boersen, go the bubble to warn correctional officers about the close proximity of a prisoner who recently threatened him, or show any visible sign of apprehension at various moments when Prisoner Boersen stood only a few feet away from him. *See* Cell Block Angle 0:14–0:36. In short, McKissic's behavior leading up to the attack in the security camera video is not consistent with being in a room with another prisoner who recently threatened him.

The Court need not credit McKissic's allegations that he warned Defendants that Prisoner Boersen threatened him during his shift because video evidence

contradicts those allegations. No reasonable jury could credit his allegations. *See Scott*, 550 U.S. at 380; *King*, 97 F.4th at 389. Here, McKissic's complaint, his medical records, and the security camera video all suggest Prisoner Boersen attacked McKissic unprovoked and at random. Other than a mere allegation from McKissic in his briefing, the record does not include any evidence that Defendants knew of a risk or could draw an inference of potential risk, both requirements of the subjective prong, that Prisoner Boersen would attack McKissic. The Court must therefore reject McKissic's argument that he warned Defendants about Prisoner Boersen's threats. Accordingly, McKissic failed to demonstrate an Eighth Amendment violation with this argument.

3. <u>Whether Defendants Remained in the Bubble During the Attack</u>

McKissic also alleged that Defendants failed to act as they sat in the bubble during the attack. Specifically, McKissic claimed he was "stabbed several times before either Defendant could respond." ECF No. 26, PageID.121. McKissic also alleged "the unit officers were ALL in a secured booth" during the attack. *Id.* at PageID.124.

McKissic's account that Defendants did not intervene until after Prisoner Boersen stabbed him leaves out significant context provided by the security camera video. In the seconds preceding the attack, the security camera video shows no argument between McKissic and Prisoner Boersen. Bubble & Dayroom Angle, 0:30–0:37. Neither McKissic's nor Prisoner Boersen's body language suggested they were preparing to fight, as McKissic continued mopping the floor near the unit base area wall while Prisoner Boersen stood near the bubble's entrance before walking to

McKissic. *Id.* Roughly three to four seconds before the attack, Defendant Okpa entered the unit base area to escort Prisoner Boersen to the health clinic. *Id.* at 0:32–0:35. When Prisoner Boersen lunged at McKissic and began stabbing him, Defendant Okpa stood only a few feet away in the unit base area, albeit with his back facing McKissic and Prisoner Boersen. *Id.* at 0:36–0:37. The security camera video at that moment directly contradicts McKissic's assertion that all Defendants were in the bubble during the attack. *Contrast* ECF No. 26, PageID.121, 124 (McKissic alleging all Defendants were in the bubble during the attack), *with* Bubble & Dayroom Angle, 0:36–0:39 (showing Defendant Okpa in the unit base area during the attack).

Within two seconds of the attack, Defendant Okpa turned around and immediately rushed toward McKissic and Prisoner Boersen. Bubble & Dayroom Angle, 0:37–0:39. As McKissic fell and Prisoner Boersen stepped back, Defendant Okpa inserted himself in between the two, facing Prisoner Boersen. *Id.* at 0:40–0:42. At no point after Defendant Okpa inserted himself did Prisoner Boersen get close to McKissic, as other corrections officers secured Prisoner Boersen and led him away. Cell Block Angle at 0:41–1:21.

Defendant Okpa's immediate intervention ensured Prisoner Boersen's attack did not last any longer than three seconds. Bubble & Dayroom Angle, 0:38–0:41. And contrary to McKissic's pleadings, Defendant Okpa's near-immediate intervention was possible only because he was already in the unit base area when the attack began. *Contrast id.* at 0:39, *with* ECF No. 26, PageID.121, 124.

Defendant Okpa's immediate reaction to the attack and intervention falls far short of an Eighth Amendment violation. Bubble & Dayroom Angle, 0:38–0:41. Under McKissic's theory, any prison attack would constitute an Eighth Amendment violation, even if corrections officers made an immediate attempt to intervene as soon as they saw the attack occur, as Defendant Okpa did here. *See id.* at 0:36–0:41. An Eighth Amendment deliberate indifference claim requires far more to conclude on a summary judgment motion that a prison official "knew of and disregarded [an] excessive risk to the inmate's health or safety." *Finley*, 102 F.4th at 805; *see, e.g.*, *Flint ex rel. Flint v. Ky. Dep't. of Corr.*, 270 F.3d 340, 343–46, 355 (6th Cir. 2001) (allowing an Eighth Amendment deliberate indifference claim to survive summary judgment when there were repeated warnings made to prison staff and improper enforcement of security protocols). Thus, McKissic's final argument fails to demonstrate Defendants violated his Eighth Amendment rights.

***

McKissic failed to carry his summary judgment burden because his three arguments either lack support from or contradict the record. *See Celotex Corp.*, 477 U.S. at 323. McKissic's summary judgment argument ultimately does not prove Prisoner Boersen's attack against him warrants constitutional liability. *See Farmer*, 511 U.S. at 834. Therefore, the Court will deny McKissic's summary judgment motion.

*C. Defendants' Motion for Summary Judgment*

Defendants argued that they are entitled to summary judgment because the undisputed facts demonstrate that McKissic cannot satisfy the objective or the subjective prong. The Court agrees and will address both parts of Defendants' motion below.

1. <u>Objective Prong</u>

The Eighth Amendment's objective prong requires an inmate to be "incarcerated under conditions posing a substantial risk of serious harm." *Finley*, 102 F.4th at 805. Defendants argued McKissic was not subjected to conditions posing a substantial risk of serious harm because "prisons naturally experience high levels of violent crime." Thus, "a single isolated attack on an inmate cannot give rise to a deliberate indifference claim because the inmate will be unable to show that officials were consciously aware of the risk of an attack." ECF No. 40, PageID.216 (quoting *McDuff v. Addis*, No. 1:17-cv-912, 2018 WL 3239491, at *3 (W.D. Mich. 2018)); *see also Lewis v. McLennan*, 7 F. App'x 373, 375 (6th Cir. 2001). Defendants claimed Prisoner Boersen's attack against McKissic was nothing more than a random assault. ECF No. 40, PageID.207.

The undisputed facts in the record support Defendants' characterization of the attack as a random assault. First, contrary to what McKissic argued in his response brief, ECF No. 47, PageID.377–378, 380–82, the declarations from Defendants Okpa and Adegbola, Lawrence McKinney, an assistant deputy warden of MRF, and Tisha Walt-Davis, a limited licensed psychologist employed by MDOC at the MRF, all

confirm Prisoner Boersen, as a Level IV inmate, was not required to be escorted or otherwise restrained. ECF No. 40-2, PageID.229; ECF No. 41-1, PageID.255; ECF No. 40-6, PageID.245–246; ECF No. 40-7, PageID.248. Second, the security camera video showed Defendant Okpa only a few feet away from McKissic and Prisoner Boersen when the attack began. Defendants, therefore, did not subject McKissic to a substantial risk of serious harm when by not escorting or restraining Prisoner Boersen in the unit base area. *See* Bubble and Dayroom Angle, 0:37–0:40.

Because Defendants met their burden demonstrating a lack of genuine issue of material fact, *Celotex Corp.*, 477 U.S. at 323, McKissic must present the "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. As discussed above, while McKissic cited several MDOC policies and administrative rules, he failed to prove those rules required Defendants to escort or restrain Prisoner Boersen once he exited his cell. *See* ECF No. 26, PageID.121, 126, 129, 130; ECF No. 47, PageID.386, 389. McKissic also never addressed the security camera video contradicting his account of the attack in his response. McKissic did not rebut these facts from Defendants' motion with evidence from the record, as he challenged only the validity of the declarations and offered a conclusory argument that "missing parts" of the security footage would support his claims. ECF No. 47, PageID.380–382, 383–384. Even then, McKissic's complete lack of apprehension or hostility toward Prisoner Boersen when the latter entered the unit base area prevents any reasonable jury from concluding McKissic previously warned Defendants that

Prisoner Boersen threatened him during his shift. *See Scott*, 550 U.S. at 380; *King*, 97 F.4th at 389.

Based on the record before the Court, Defendants treated Prisoner Boersen in a routine manner adherent to MDOC rules and procedures and had no notice Prisoner Boersen was more dangerous than the average Level IV inmate, a reality that falls far short of the objective prong's requirement of a substantial risk of serious harm. *See Finley*, 102 F.4th at 805 (citing *Farmer*, 511 U.S. at 828). In short, the declarations and the security camera video show McKissic cannot satisfy the objective prong because he was not incarcerated under conditions posing a substantial risk of serious harm because of Defendants' conduct.

2. <u>Subjective Prong</u>

The Eighth Amendment's subjective prong requires a plaintiff to prove three elements: the individual defendants (1) were actually aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) actually drew the inference; and (3) consciously disregarded the risk. *Westmoreland*, 29 F.4th at 726–27.

Here, Defendants argued McKissic cannot satisfy any of the three elements because no evidence supports that Defendants acted with criminal recklessness. ECF No. 40, PageID.220. Defendants asserted that they followed proper MDOC procedure in facilitating Prisoner Boersen's health clinic visit and never knew of or disregarded any risk of harm Prisoner Boersen may have posed to McKissic. *Id.* at PageID.220–221. In response, McKissic merely repeated conclusory arguments discussed above: Defendants were "fully aware of the dangers, that a jury may [concur], when Plaintiff

alerted or warned both Defendants, that [Prisoner Boersen] had made threats to harm Plaintiff . . . ." ECF No. 47, PageID.385. McKissic's response did not include facts to support his claims, nor did he address the portrayal of the attack from the security camera video.

The undisputed facts support Defendants' argument: Neither Defendant Okpa nor Defendant Adegbola were aware Prisoner Boersen was going to attack McKissic. Contrary to McKissic's argument that he warned Defendants that Prisoner Boersen had threatened him, the security camera video showed no sign of apprehension or argument between McKissic and Prisoner Boersen. *See* Cell Block Angle, 0:12–0:26; Bubble and Dayroom Angle, 0:23–0:36. Based on the security camera video, it was only apparent Prisoner Boersen would attack McKissic the second before the attack occurred, when Prisoner Boersen pulled the shank out of his pocket and lunged toward McKissic. Bubble and Dayroom Angle, 0:36–0:37. Defendant Okpa then intervened a few seconds later. *Id.* at 0:38–0:41. In other words, having followed proper procedure in allowing Prisoner Boersen to exit his cell without escort or restraint, and with no sign of apprehension or violence until the second before the attack, the record supports Defendants' claim that they were unaware that Prisoner Boersen would attack McKissic. *See Bishop*, 636 F.3d at 767. Thus, McKissic cannot satisfy any element of the subjective prong.

Accordingly, Defendants demonstrated that a genuine dispute of material fact does not exist regarding the objective and subjective prong of an Eighth Amendment deliberate indifference claim. McKissic failed to meet both prongs and cannot show

based on record that a constitutional violation occurred. Thus, Defendants are entitled to summary judgment.

II. Qualified Immunity

Qualified immunity acts as an affirmative defense to § 1983 claims. *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). It "shields public officials from money-damages liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (citation modified) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Once a defendant asserts qualified immunity, a plaintiff bears "the burden of showing that defendants are not entitled to qualified immunity." *Mahen v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citation omitted). To overcome qualified immunity, a plaintiff must plead facts showing (1) that defendants violated a constitutional right, and (2) "that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quotation omitted). If defendants prevail on either prong, they must be granted qualified immunity. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Here, Defendants argued McKissic failed to overcome qualified immunity because he did not demonstrate that they committed a clearly established constitutional violation. ECF No. 40, PageID.222. In his response to Defendants' motion for summary judgment, McKissic largely repeated his Eighth Amendment

arguments and asserted that Defendants should not receive qualified immunity because they did not follow MDOC rules regarding prisoner safety and caused McKissic to be assaulted. *See* ECF No. 47, PageID.389–390.

Because the Court concludes Defendants did not violate McKissic's Eighth Amendment rights, McKissic necessarily fails on the first prong of the qualified immunity analysis: proving Defendants violated a constitutional right. Therefore, Defendants are entitled to qualified immunity on McKissic's Eighth Amendment claims.

III. McKissic's Motion for Reconsideration of Default Judgment

After the parties filed their respective motions for summary judgment, McKissic moved to reconsider the Court's denial of McKissic's request for default judgment. As the Court explained in its previous order denying McKissic's first motion for default judgment, the Court cannot enter default judgment until the Clerk of Court has made an entry of default. ECF No. 37, PageID.188; *see also* 11A *Wright & Miller's Federal Practice and Procedure* § 2682 ("Prior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule 55(a)."). Because the Clerk of Court has still not entered a default, the Court must deny the motion.

IV. McKissic's Motion to Appoint Counsel

Last, McKissic moved the Court to appoint counsel to represent him because of his declining eyesight. ECF No. 35, PageID.182. Because the Court will grant Defendants' motion for summary judgment, the motion for counsel is moot.

Even if the Court's decision did not render McKissic's motion moot, the Court would still deny McKissic's motion because he has not demonstrated exceptional circumstances requiring the Court to appoint counsel under Sixth Circuit precedent. There is no constitutional right to counsel in a civil case, but the Court may nevertheless determine whether to appoint counsel to a party in "exceptional circumstances." *Garrison v. Mich. Dep't of Corrs.*, 333 F. App'x 914, 917–18 (6th Cir. 2009) (citing *Lavado v. Keohane*, 992 F.2d 601, 606 (6th Cir. 1993)). The decision to appoint counsel depends on the type of case, the complexity of the issues, and the litigant's ability to represent himself. *Id.*

Here, while McKissic complained of his eyesight, he did not establish that his legal claims were so complex that they required counsel. Instead, McKissic demonstrated an adequate understanding of the law governing Eighth Amendment claims throughout the litigation.

Thus, even if the motion was not rendered moot, McKissic's failure to establish that exceptional circumstances exist would require the Court to deny the motion.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Defendants' motion for summary judgment [40] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment [26] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file response to Defendants' motion for summary judgment [47] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for request for counsel [35] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for reconsideration of default judgment [46] is **DENIED**.

**IT IS FURTHER ORDERED** that the case is **DISMISSED WITH PREJUDICE**.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: October 15, 2026